RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE __11/14__ __07__

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

SETH A. BECKER                                    CIVIL ACTION 99–1198

VERSUS                                            CHIEF JUDGE HAIK

TIDEWATER, INC., ET AL                            MAGISTRATE JUDGE HILL

## REASONS FOR JUDGMENT

On June 8, 1999, Seth A. Becker was working for Baker Hughes, Inc., assisting in a gravel pack operation aboard the jack-up R&B Falcon/Cliffs Rig 153, when he was horrifically injured. The plaintiff filed suit against several defendants under the General Maritime Law and Jones Act and, alternatively, under the Longshore and Harbor Worker's Compensation Act. A Jury Trial was held in July 2001, concluding in a verdict finding plaintiff to be a Jones Act seaman and awarding him damages. The jury apportioned fault among the defendants assigning each a percentage. On appeal, the United States Court of Appeals for the Fifth Circuit reversed the jury's finding and held the plaintiff to be a longshoreman, set aside liability and damage findings, and remanded the case to this Court for further proceedings. *Becker v. Tidewater, Inc.*, 335 F.3d 376, (5th Cir. 2003). Following various procedural matters, a limited second trial as held as an admiralty action, tried without a jury, pursuant to Federal Rule of Civil Procedure 9(h). The Court has now completed a full review of the record, including all exhibits and memorandums, and fully consideration of the arguments of counsel and the applicable law.

-1-

The following issues were raised by the parties and are ruled on as follows:

1. Discovery and Admissibility of the Written Settlement Agreement (Doc. #676)–the Court finds the settling parties complied with existing law by revealing the existence of a sharing agreement. The specifics of the agreement need not be revealed at this time, not even to the Court. Tidewater presented its arguments and participated in the trial of this matter without knowledge of the information contained in the Settlement Agreement. To reveal said information following the trial would not change the record or the arguments made. The Court finds there is no prejudice to Tidewater by denying the admissibility of the Settlement Agreement at issue in this matter.

2. Motion to Exclude Evidence of Baker's Employer Fault and/or For Judgment as a Matter of Law that Baker is Free from Fault in its Capacity as Time Charterer of the M/V Republic Tide (Doc. #662) is DENIED. The Court will consider all relevant evidence and apportion fault accordingly.

3. Baker Hughes' Objection to Tidewater's Introduction of Certain Expert Reports (Doc. #682) is GRANTED. The Court finds the expert reports in question contain information that go beyond the scope of this Court's rulings regarding new information and beyond the scope of the original reports of Dr. Kenneth Boudreaux and Dr. Robert Meier. Thus, the evidence will not be considered.

4. Baker's Deposition Designations are ADMITTED and will be considered out of an abundance of caution in light of the Fifth Circuit's ruling, to the extent they are relevant to the issue of gross negligence.

-2-

It is noted that, for the remainder of this Ruling, Baker Hughes, Inc. And Baker Oil Tools,

a division of Baker Hughes Oilfield Operations, Inc. will be referred to as "Baker" and Tidewater

Inc., Tidewater Marine, LLC, Twenty Grand Offshore, Inc., Pental Insurance Company and

Cerain Underwriters at Lloyds, Subscribing Risk No. LE0106200 will be referred to as

"Tidewater".

## FINDINGS OF FACT

The general facts of this case were determined at the original trial of this matter and

summarized by the appellate court. Consequently, this Court will not revisit each and every detail

previously established, but will, instead, discuss only those pertinent matters.

In June 1999, Seth Becker, a 22 year old student at Montana Tech University, was working

as a full time intern for Baker Hughes. On June 7, 1999, Seth boarded the M/V Republic Tide as

a member of a six man crew to assist in a gravel pack operation aboard the jack up rig R&B

Falcon/Cliffs Rig 153. Upon boarding the vessel, Seth was given a short orientation, lasting

approximately 10 or 15 minutes. (Trans. Vol. II, P. 113-114). During the orientation, neither Seth

nor the other members of the Baker team were instructed on operating, maintaining, or safely

handling an emergency situation with the Baker equipment, in violation of Baker's safety

program. (Trans. Vol. III, P. 460). The M/V Republic Tide was owned and operated by

Tidewater and was working for Baker pursuant to a Blanket Time Charter Agreement. The

Blanket Time Charter Agreement was signed on January 23, 1998 and was in effect at the time of

the accident. The jack up rig vessel was owned by Cliff's Drilling Company and operated by

R&B Falcon USA, Inc.

The M/V Republic Tide was outfitted with various pieces of Baker equipment required to perform the work at hand, including a Coflex hose reel.  The Coflex hose/Coflex hose reel was a piece of equipment owned and operated by Baker and used in the course of its business.  The Coflex hose was used to pump materials from the vessel directly into the wellhead. (Trans. Vol. II, Pp. 176-177, Trans. Vol. III, P. 411).  The vessel was also outfitted with an iron sleeve, fabricated by Baker, referred to as the "blue shoe".  The steel Coflex hose at issue was run from the M/V Republic Tide, over the rig's handrail through the blue shoe, to the drill floor.  The hose was then chained to various objects by which it passed.  The positioning, securing, and use of the Coflex hose was solely within the discretion and control of Baker.

In order to obtain the Cofex hose system, Baker contracted with Coflexip Stena Offshore for the hose and power unit.  Coflexip subcontracted with Hydra Rig, which provided the reel, and obtained a power pack from Hydradyne. (Trans. Vol. III, Pp. 539-540). This project was overseen on behalf of Baker by Charles Knighton, a non-engineer who lacked experience on offshore pumping vessels. (Trans. Vol. III, Pp. 485-486).  This was Knighton's first experience with a Coflex reel system. (Trans. Vol. III, P. 493). An important feature of the Coflex hose system was a quick release valve, which released the brake and opened the jaws in order to release the hose. The system would not work properly unless the hose was completely unwrapped from the reel.  If there were wraps remaining on the spool, the boat would have to pull away to unwrap the hose from the reel and release it. (Trans. Vol. VIII, P. 1618). Neither this information, nor the fact that the quick release took approximately 15 seconds to work, was conveyed by Baker to the crew on the M/V Republic Tide. (Trans. Vol. III, Pp. 525-527). The crew lacked proper training and instruction as to how to work the Coflex hose and reel system and were lacking pertinent

-4-

information about the system. (Trans. Vol. II, Pp. 174-176; Trans. Vol. III, P. 350, 353, 422-423, 430, Trans. Vol. VIII, Pp. 1442-1443, 1449).

Additionally, Baker made its own modifications to the Coflex reel assembly, including the addition of a back up power system using Baker owned auxiliary skid and hard piping which ran from the hydraulic unit to the Coflexip unit. (Trans. Vol. III, Pp. 419-422, 516-517, 531, 537). The changes in the system involved Baker drilling through the rear of the console, causing the once closed system to be open to contamination. (Trans. Vol. III, P. 420). Following these modifications, which actually caused a change in the structure of the unit itself, Baker failed to test the system and failed to flush the system. (Trans. Vol. III, Pp. 421, 522, 546). In addition to the modifications to the system itself, Baker also installed the aforementioned "blue shoe", which was attached to a handrail with chains. The blue shoe was fabricated by Baker employees without the assistance or advice of an engineer. (Trans. Vol. III, P. 375). It was used in conjunction with the Coflex hose system as a part of Baker's operations. In addition to not testing the modified Coflex system as a whole, Baker also failed to test the blue shoe and what it could safely handle. (Trans. Vol. V, Pp. 910-911).

Under the Time Charter, Baker was responsible for maintaining and operating the well stimulation equipment it installed on the M/V Republic Tide. (Trans. Vol. III, Pp. 349-350, 456, 462). Tidewater was in charge of the operation and navigation of the vessel, including maintenance. The Charter specifically states:

> The vessel shall be delivered to CHARTERER at the port previously agreed upon
> with clear decks and being on her delivery properly equipped and in every respect
> seaworthy and in good running order and in every way fit and ready for

-5-

CHARTERER's use and for the employment intended, so far as the exercise of
due diligence can make her; and OWNER undertakes to so maintain the vessel
during the period of service under this Charter. (Charter, Section III).

The Charter also contained an indemnity provision requiring Baker to indemnify
Tidewater for:

injury to, illness or death of the personnel or employees of CHARTERER, of
CHARTERER's invitees, or CHARTEREs sublessee(s) of the vessel, or of
CHARTERER's contractors or subcontractors (other than any of the OWNER
INDEMNITEES), however said injury, illness or death arises or occurs, whether
through the negligence in whole or in part of any of the OWNER
INDEMNITEES, unseaworthiness of any vessel or otherwise; and CHARTER
shall protect, defend, indemnify, and hold harmless the OWNER INDEMNITEES
from and against all claims, suits, losses, liabilities, expenses, demands, costs
(including reasonable attorneys' fees) and/or damages as a result of such illness,
injury, or death. (Charter, Section XIV).

Turning to the date of the accident, the M/V Republic Tide left the Port of Fourchon
heading for the R&B Falcon jack-up drilling rig/Cliffs 153 located in East Cameron Block 38 in
the Gulf of Mexico. At some point during the journey, communication between the M/V
Republic Tide and the rig was had. Although there is widely differing testimony as to the issue,
Daniel Ray Sibley, an independent party and contractor for Ambar, testified that he was present
when a person of authority on the M/V Republic Tide stated over the radio to Mickey Hoffpauir,
the company man, that the vessel had had a bow thruster problem, but that the problem had been

fixed. (Depo., Pg. 15) Mr. Sibley also testified that, during the exchange, it was agreed that the vessel could drop its anchor and back up to the rig. Given that Mr. Sibley is an independent party with no interest in the outcome of this case, the Court finds this testimony to be credible. However, on this subject, the Court also notes that Tidewater employees Clarence Polk, Daniel Givens, and Steven Lachney, as well as Baker Employees Kenneth Credeur, Brandon Latiolais, and David Orsak, all testified that the vessel had not experienced any prior bow thruster problems before the accident. (Trans. Vol. VIII, P. 1473; Vol. II, Pp. 161-162, 219-220, 294, and Vol. III Pp. 340, 390). The boat had been commissioned approximately 15 or 16 months before the accident. (Trans. Vol. III, P. 374). Additionally, the bow thruster had been replaced on the M/V Republic Tide only six months before this occurrence, in January 1999. (Trans. Vol. 11, P. 161).

Upon arrival at the rig, the M/V Republic Tide attempted to drop its anchor only to find, after it had dropped approximately 10 feet, that the anchor windlass had a hydraulic oil leak. The leak was discovered by Tidewater's Chief Engineer Clarence Polk and reported to Captain Givens. (Trans. Vol. II, P. 98 ). Upon learning this information, Captain Givens told Mr. Polk to pull the anchor back up (Trans. Vol. II, P. 99). Captain Givens did so in order to avoid the possibility of not being able to retrieve the anchor if a seal became loose from the leak and also out of concern for pollution laws which he may have violated by allowing hydraulic fluid to leak into the Gulf of Mexico. (Trans. Vol. II, P. 100). They instead tied the vessel off with ropes. Captain Givens chose the method of tying the boat in order to give the vessel more pivotability. (Trans. Vol. II, P. 165). Although Captain Givens did not remember if he notified anyone of the anchor problem, Baker supervisor Kenneth Credeur was, prior to the accident, aware of the fact

-7-

that the M/V Republic Tide was operating without an anchor and was not concerned because "we used the bow thruster all the time". (Trans. Vol. III, P. 405). Baker employee Brandon Latiolais was also aware of the situation when he boarded the rig to start the job. (Trans. Vol. III, P. 344). It was not abnormal to work without the anchor because the water is often too deep or contained too many pipelines. (Trans. Vol. II, P. 102). Although Mr. Credeur, Baker's supervisor, met with all supervisory personnel aboard the rig, he did not inform them of the vessel's anchor failure. (Trans. Vol. II, P.376-377). Knowing that the vessel was not anchored, and knowing that its customers and other rig personnel were not fully apprised of the situation, Baker made the decision to proceed with the job. Baker could have refused to proceed with the job under the circumstances, but did not do so.(Trans. Vol. II, P. 159). There is no evidence to show that Tidewater objected to proceeding with the job either.

Prior to the anchor problem experienced at the job site described above, Clarence Polk, Tidewater's Chief Engineer, testified that there had been no problems with the anchor before that and that he had personally inspected and provided routine maintenance to the anchor on May 22 and May 25, 1999. During this time, he added approximately 10 gallons of hydraulic fluid to the system. (Trans. Vol. VIII, Pp. 1475-1477). He supported this testimony with his written logs. The Court finds his testimony to be credible. Although it is a fact that Tidewater did not have evidence of an anchor inspection on the two quarterly inspection reports prior to the accident, as is required normal procedure under the United States Coast Guard's Streamlined Inspection Program, Tidewater's engineer did, in fact, inspect the anchor in the interim period. (Trans. Vol. II, Pp. 246-251). The Court finds that, although the inspection was not done at the proper time, it was actually completed.

-8-

After securing the boat, the Baker crew began rigging up for the gravel pack job. At some point shortly thereafter, the M/V Republic Tide encountered a problem when it lost its bow thruster. When the bow thruster problem arose, Captain Lachney sent the vessel's engineer Clarence Polk to investigate the problem and he called the rig, and spoke to the crane operator, to inform them of the bow thruster failure. (Trans. Vol. II, P. 259). The urgency of the situation was compounded by the strong current present in the Gulf of Mexico that day. Moments later, as the boat was drifting toward the starboard stern leg of the vessel, the port line holding the vessel broke. Sometime thereafter, Captain Lachney powered up the vessel's port throttle in forward and starboard throttle in reverse in order to avoid making contact with the other leg on the rig and to break the starboard line holding the vessel. He did not inform any person on the rig of his actions before doing so. (Trans. Vol. II, Pp. 261-265). Also, sometime during this time period but before he broke the second line, Captain Lachney told the Baker employees on the rig that he was experiencing a bow thruster problem and that someone needed to disconnect the Coflex hose from the boat. Baker employees Brandon Latiolais and Jason Foreman responded to the situation by attempting to disconnect the hose. (Trans. Vol. VIII, P. 1422; Trans. Vol. III, P. 333; Trans. Vol. II, P. 271). A point later arose where the boat was no longer secured to the rig with ropes, but was attached only by the Coflex hose.

Upon arriving at the Coflex hose reel, several discoveries were made. Namely, the hose was not completely unspooled from the reel; the quick disconnect button was not releasing the hose; and the Baker employees were unable to manually move the reel. The jaws holding the hose were opening, but the hose was not free wheeling and releasing. At some point, they then recruited the assistance of Clarence Polk, who had more mechanical knowledge, to help resolve

-9-

the problem. Through trial and error, Clarence Polk eventually fixed the problem by bleeding air off of the system and they were able to reel in the hose. The hose was, at that time, disconnected on the rig end, but still attached at the reel end on the vessel. (Trans. Vol. III, Pp. 352-357; Trans. Vol. VIII, Pp. 1423-1428; Trans. Vol. II, P. 273).

At some point during the time while those individuals aboard the vessel were attempting to operate the quick release and drop the hose from that end, Mr. Credeur, who was on the rig and had been advised of the bow thruster malfunction by the crane operator John Corkern (through Falcon OIM Don Frederick, who answered the call), ordered Troy Broussard, David Orsak, and Seth Becker, an inexperienced summer intern, to disconnect the Colfex hose at the hammer union on the rig. This instruction came after a second call to the rig by Captain Lachney informing them that the hose was going to have to be disconnected from the rig because the boat was unable to do so. (Trans. Vol. II, P. 265). Knowing that the situation was an emergency and knowing that, if the boat moved, it would pull the massive Coflex hose, Mr. Credeur, Baker's supervisor, sent the men into that situation without checking the status of the vessel or the level of danger into which he was sending them. (Trans. Vol. III, Pp. 386, 401). Donald Frederick, Falcon's employee, also failed to keep track of the vessel and hose locations. (Trans. Vol. IV, P. 633). Donald Frederick, Falcon's OIM, John Corkern, the crane operator and Kenneth Credeur, Baker's supervisor, all knew the situation was an emergency. (Trans. Vol. IV, Pp. 646, 657, 664). No one warned Seth Becker, the summer intern, of the possibility of harm he was facing in that situation where he was not needed and should not have been placed. (Trans. Vol. III, P. 397).

Several minutes after the bow thruster failed and the vessel notified John Corkern of the situation, and while the three Baker employees were attempting to disconnect the hose on the rig,

-10-

directly in harm's way, Captain Lachney powered up the boat and broke the starboard line. He did so without warning to the rig and with full knowledge that the boat would move and pull the Coflex hose with it. (Trans. Vol. II, P. 311). When the boat moved, the hose was pulled taut and dragged across the deck into the plaintiff, Seth Becker, who was caught between the hose and the backstop aboard the rig. The accident caused the plaintiff horrific injuries, resulting in the total amputation of both of his leg below the knee. The accident further resulted in mental and emotional injuries to this young plaintiff, resulting from both the experience itself as well as massive blood loss.

After the accident, Baker project specialist Gerald Blanchard inspected the Coflex reel system to determine the problem. He found that the auxiliary unit worked properly, but when the main console was used, air was introduced into the system causing it to lock up. (Trans. Vol. VIII, P. 1495). Upon further inspection, he found that a clamp on a line hose was loose, which allowed air into the hydraulic system. Once the clamp was tightened, the system worked properly. (Trans. Vol. VIII, Pp. 1496-1498). Baker personnel were the last people to work inside of the console housing the loose clamp. Baker personnel were also periodically in this console to change the filter in the system. (Trans. Vol. VIII, P. 1501). It would have been simple for Baker personnel to check the connections while changing the filter.

The Court finds it is a fact that the negligence of both Tidewater and Baker caused the plaintiff's injuries. And that, although other parties aboard the vessel should have warned of the danger of the situation or taken more proactive measures, that fault was not the cause of the damage in this case.

-11-

## CONCLUSIONS OF LAW

In accordance with the Fifth Circuit's Ruling in *Becker v. Tidewater, Inc.*, 335 F.3d 376, 5th Cir. 2003, it has been established that the plaintiff is a maritime worker covered under the Longshore and Harbor Worker's Compensation Act (LHWCA) and that the LHWCA governs any recovery at trial. Section 905(a) of the LHWCA precludes an employee from suing his employer in tort. Consequently, Baker can not be held liable to Seth Becker in its capacity as his employer. It can, however, be held liable under section 905(b) if at fault in its capacity as the time charterer of the M/V Republic Tide. *Kerr McGee v. Corp. v. Ma-Ju Marine Services, Inc.*, 830 F.2d. 1332 (5th Cir. 1987). Section 905(b) of the LHWCA provides the exclusive remedy for longshoreman against a vessel. The *Kerr McGee* court stated that a time charter can be liable under section 905(b) if the harm caused is "within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement."

Under a traditional time charter agreement, the time charterer directs the vessel's commercial activities. *Moore v. Phillips Petroleum Co.*, 912 F.2d. 789 (5th Cir. 1990). In this case, the Charter Agreement also shifted other responsibilities to Baker. According to the testimony of Baker's employees at trial, as well as the language of the Charter, which included allowing Baker to install equipment and maintain ownership, Baker was responsible for and retained control over the equipment it installed on the vessel. The equipment was installed to assist Baker's performance of specialized services on oil and gas wells. As such, the Coflex hose, Coflex hose reel assembly, blue shoe and pumping operations associated with this equipment were within Baker's exclusive control under the Charter. Tidewater was in control of the operation, navigation, and maintenance of the vessel.

-12-

Under Section 905(b) of the LHWCA, the liability of the vessel is for negligence and is not based on the warranty of seaworthiness. In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 68 L.Ed. 2d. 1, 101 S.Ct. 1614 (1981), the United States Supreme Court outlined three main duties owed by the vessel for which 905(b) liability may be imposed:

1. The "turnover duty" which requires the shipowner to exercise ordinary care to insure the ship and its equipment are turned over to an outside contractor in such condition that an experienced stevedore will be able to, with the exercise of ordinary care, carry on its cargo operations. A vessel must warn a stevedore of dangers that are known to it, or should be known through the exercise of reasonable care.

2. The "active control duty" which requires a shipowner to exercise reasonable care to prevent injuries to longshoreman in areas that remain within the active control of the shipowner.

3. The "duty to intervene" which requires the shipowner to warn or intervene when he becomes aware that the ship or its gear pose a danger to the longshoremen or that the stevedore is acting unreasonably in failing to protect the longshoreman against danger.

In *Moore*, the Fifth Circuit Court of Appeals stated the "traditional allocation of duties between the employer, time charterer, and vessel owner places liability for harm on the party that is most directly responsible for the dangerous condition that caused the harm." In the instant case, one thing is strikingly clear–no one party was solely responsible for the dangerous conditions that resulted in the grave harm that befell Seth Becker. With that, the Court will allocate fault between the parties for their roles in the various dangerous conditions that, when brought together, caused the resulting harm to the plaintiff. The Court recognizes, as set forth by the Supreme Court in *Kerr-McGee,* that Baker's two duties, one as employer and the other as

-13-

time charter, are separately owed and do not affect each other.

Both Tidewater, who retained control over the operation and navigation of the vessel, and Baker, who controlled the commercial activities of the vessel, decided to proceed with the job fully armed with the knowledge that the anchor on the M/V Republic Tide had not been deployed. Either party could have prevented the commencement of the job at that point. Although this may not have been completely out of the ordinary because the bow thruster was often used to hold the boat in these operations, it was, on this day with rather strong currents, a negligent decision by both parties. Additionally, neither party notified ERT and/or Falcon, of the anchor situation. Baker is held to be responsible for this negligence, in its capacity as time charter for directing the commercial activities of the vessel and as the party responsible for well stimulations under the Charter, because it was informed of the situation by Tidewater, but failed to pass the information along to its customers and crew. Both Kenneth Credeur and Brandon Latiolais, Baker employees, testified to the fact that they were aware of the vessel's failure to anchor, but did not inform any other parties even though they met with their customers prior to starting the job.

With respect to the Coflex reel system, the Court finds Baker to be negligent under 33 U.S.C.A. section 905(b) as the time charter responsible for the installation and maintenance of its equipment installed aboard the M/V Republic Tide. Baker negligently modified the Coflex hose system and, subsequently, failed to test, clean or properly maintain the equipment. Additionally, Baker failed to properly train and instruct its crew on the operation of the system it installed. This led to a failure to completely unwrap the hose from the reel, so that the quick disconnect feature could properly function. The failure to maintain the system properly led to the

introduction of air into the system which caused a lock up that prevented the crew from manually reeling, or unreeling, the system. These negligent actions caused the hose to remain attached to a vessel that was unable to maintain its position, causing unthinkable danger to the crew and, ultimately, incredible damage to the plaintiff.

Baker is not responsible for these actions as an employer, it is responsible as the time charterer who installed, and maintained ownership and control of, the equipment on the vessel. The Court agrees with Steve Killingsworth, plaintiff's expert, who testified that the way Baker chose to deploy the reel rendered the system "unreasonably dangerous" and "defective" and that, if any of this very sophisticated company's engineers had done a functionality test, it would have observed that the quick disconnect could not work if the hose was not completely unreeled. (Trans. Vol. V, P. 927, 928). Baker's actions and inactions violated its turnover duty to maintain its Coflex reel system in such condition that a reasonable stevedore could, through the exercise of reasonable care, carry on its operations. Additionally, Baker failed to warn as it could have, through the exercise of reasonable care, discovered that the hose must be completely unspooled in order for the quick disconnect emergency system to work and that there was a loose clamp in the console which caused excess air to enter the system. Further, Baker violated its active control duty by failing to exercise reasonable care with respect to its workers who were operating the Coflex hose system. The Coflex system and the area surrounding it were in the active control of Baker. The failure to maintain the system and provide proper training on its use demonstrates a lack of reasonable care to prevent injuries to the plaintiff. Finally, although Baker was fully aware that the situation was an emergency and posed a danger to people aboard the rig, it failed to warn Seth Becker of the gravity of the situation. This lack of action is a violation of Baker's

duty to intervene.

In addition to the installation of the Coflex hose system, Baker also designed, built, and installed the blue shoe on the M/V Republic Tide. The blue shoe, created without the assistance of an engineer, was designed to guide the Coflex hose over the handrails and hold it in place. It was chained to the handrail with small chains. Like the Coflex hose system, Baker failed to test the blue shoe's capabilities and functionality prior to the accident. The Court again agrees with the plaintiff's expert, Mr. Killingsworth, that the blue shoe was "an accident waiting to happen" and was both unreasonably dangerous and defective at the time of the accident. (Trans. Vol. V. 927).

Like the Coflex hose, the blue shoe was an appurtenance installed on the vessel by Baker as the time charterer. It remained in Baker's ownership and control at all times. The dangerous and defective object created a hazard to the crew and violated Baker's turnover duty. The crew could not, with reasonable care, conduct operations safely with such an object. Additionally, had Baker performed any testing, it could have, with reasonable care, discovered that the blue shoe was a useless and dangerous object which created a false sense of security for those working with it. This failure was a violation of its duty to warn. Baker's negligent fabrication and installation of the blue shoe, and its failure to test the object which it maintained control over, also amount to a violation of its active control duty because it did not exercise reasonable care with respect to the safety of Seth Becker. Finally, these actions and inactions, as owner and controller of the equipment, constitute a violation of Baker's duty to intervene to protect the plaintiff.

The Court holds that the failures of the Coflex hose system and blue shoe, which were solely caused by and in control of Baker, are negligence within Baker's realm as time charterer

and a legal cause of the plaintiff's injuries. Although Baker is also negligent for sending Seth Becker down to unhook the Coflex hose on the rig, that action was taken as its employer. That is the only action taken by Baker as an employer. All other actions were taken by Baker as the time charterer, owner and control of its equipment. Had Baker warned Seth of the dangers presented by its Coflex hose and blue shoe system; installed, tested and maintained its equipment with any reasonable care so that it could be operated safely; maintained and operated its equipment, which it actively controlled, in a manner which provided safety to the plaintiff; trained its employees on the proper use of the equipment, which is essential to its safe operation for all parties in its presence; and/or intervened when it was aware of the emergency situation, the plaintiff would not have been injured.

Baker, however, was not alone in its negligence. Tidewater also played a star role in this tragic accident that so drastically altered a young man's life. Tidewater, at all times, maintained active and complete control over the vessel's operation and maintenance. As previously stated, Tidewater shares the responsibility for the negligent decision to proceed with the job without an anchor in rough waters. That shared decision is a legal cause of the plaintiff's injuries. In addition to that, Captain Lachney's decision to break starboard line, the only line holding the vessel at all steady, without warning the rig or any other party of his actions was negligence. Even though the Court understands that Captain Lachney took that action in an effort to avoid alliding with the rig and putting those individuals aboard both the vessel and the rig in danger, doing so without warning was negligent. This action violated Tidewater's active control duty, as it failed to exercise reasonable care with respect to the safety of the men working on the vessel and rig, and its duty to intervene, as it failed to protect the workers after becoming aware of a

dangerous situation. Further, Tidewater failed to warn the plaintiff and other men aboard the rig and vessel that it was about to take a drastic action which it knew would cause the Coflex hose to move. That movement of the Coflex hose resulted in the drastic injuries sustained by the plaintiff. This negligence was a legal cause of the plaintiffs injuries.

Based on the evidence presented, the Court finds that an inspection of the anchor should have been completed at the proper quarterly intervals. The failure to do so does amount to a lack of reasonable care and, consequently, negligence as a violation of its active control duty. Tidewater retained control over its own anchor system, but failure to perform timely inspections resulted in a threat to the safety of the plaintiff. Although the anchor was inspected and maintained in the interim, this does not relieve Tidewater of its negligence in failing to follow its own procedures. It does, however, lessen the degree of negligence because the evidence shows that there was no report or evidence of an anchor problem before the accident. Consequently, it has not been proven that the vessel was unseaworthy because of an anchor condition upon delivery. Further, as stated, an inspection and maintenance did, in fact, take place shortly before the accident. Additionally, although the vessel would normally anchor in shallow water which is free from obstructions, it is not abnormal to proceed on this type of job without an anchor. Had the site been in deep water or contained more obstructions, the job would have proceeded just as it did. Additionally, the testimony of both Baker and Tidewater personnel shows that the lack of an anchor was of no moment in deciding to proceed with the job at hand.

Based on the foregoing, the anchor malfunction and negligent failure to perform the quarterly inspection does not rise to the level of acts so consequential that they render the Charter null and void. There is no proof that the vessel was delivered to the charterer in an

-18-

unseaworthy condition due to the anchor or that Tidewater had knowledge of the anchor problem before the accident. Routine maintenance by Tidewater's engineer in May 1999, only two weeks before the accident, revealed no problems with the anchor. And, because it was not abnormal to proceed without an anchor and the decision to do so here was, in fact, made jointly by Baker and Tidewater, the anchor malfunction and failure to perform a quarterly inspection are of no consequence with respect to Baker's indemnity obligation and the Blanket Time Charter.

With respect to Tidewater's bow thruster, the Court finds there is not enough evidence to prove a problem existed immediately prior to the accident which could render Tidewater liable for such knowledge. The Court notes there was testimony from both R&B Falcon and ERT that the boat was delayed due to a bow thruster problem and a denial of this allegation by Tidewater. The conflicting testimony does not weigh as heavily as the testimony of Daniel Sibley, a truly independent party. Although the Court believes Mr. Sibley's testimony concerning the communication which took place between the rig and the vessel while it was in route, it notes that Mr. Givens only *thought* the boat was running late on its way to the rig because of a bow thruster problem, he never actually heard this particular fact communicated over the radio. In fact, that issue was never established. Additionally, Tidewater employees Clarence Polk, Daniel Givens, and Steven Lachney, as well as Baker Employees Kenneth Credeur, Brandon Latiolais, and David Orsak, all testified that the vessel had not experienced any prior bow thruster problems before the accident. Given all of this information as a whole, the Court finds that a bow thruster problem was, in fact, discussed during the M/V Republic Tide's trip to the rig, but that it is unclear whether the problem mentioned was recent or something that existed before the bow thruster was replaced only six months earlier. There is overwhelming testimony from both

Tidewater and Baker employees that there had been no bow thruster problems before this accident. Additionally, and importantly, the Court finds that, based on Mr. Sibley's independent testimony, the M/V Republic Tide had reported that any bow thruster problem that had existed was, at that time, resolved. Given the testimony as a whole, the Court can not logically find that Tidewater had immediate knowledge of a bow thruster problem, prior to its arrival at Rig 153, which would have directly impacted this accident. The testimony clearly shows that any problem that might have existed was believed to be resolved and the boat was in working order. Additionally, once the bow thruster failed, Captain Lachney immediately notified the rig and, once it was determined that the hose could not be released from the vessel end and he was having trouble maintaining his position, he again made the rig aware of this information. His notifying the rig that the hose would have to be released from the rig end, not the vessel end, was a responsible act. His notifying the rig that he had lost his bowthruster was, in fact, a fulfillment of Tidewater's obligation to warn and protect the safety of individuals aboard the rig. He did, in fact, give the rig the pertinent information it needed. Unfortunately, shortly thereafter, his actions became negligent when he moved the boat without checking the situation on the rig and/or giving warning.

The bow thruster failure did amount to unseaworthiness of the vessel during the operations, but not necessarily upon delivery, but this is of no moment with respect to the plaintiff as an action under section 905(b) of the LHWCA is for negligence, not unseaworthiness. The Court further finds that the failure of the bow thruster does not rise to the level of a breach of contract that would render the indemnity provisions of the contract null and void. Even if the vessel became unseaworthy during the operations or was unseaworthy at any point in this

-20-

scenario, Baker agreed to indemnify Tidewater for damages that resulted therefrom.

In *Marquette Transportation Company, Inc. V. Louisiana Machinery Company, Inc.*, 367 F.3d. 398 (5th Cir. 2004), the Court advised than an indemnitee's obligations under a contract are relevant to the determination of its entitlement to indemnity. Additionally, the *Marquette* court emphasized reading the language of the Agreement at issue and noted that, in that case, as in our case, the indemnification agreement provided for indemnification regardless of the negligence of any indemnitee. The Blanket Time Charter in effect between Baker and Tidewater on the date of the accident specifically states that Tidewater would have no liability for "injury to, illness or death of the personnel or employees of Charterer...however said injury, illness or death occurs, whether through the negligence in whole or in part of any of the Owner Indemnties, unseaworthiness of any vessel, or otherwise." Despite any negligence or unseaworthiness attributable to Tidewater, the indemnity agreement if fully enforceable.

Additional issues raised are Tidewater negligence in that Captain Givens led personnel aboard the rig to believe the M/V Republic Tide would be anchored, rendering the issue of vessel movement moot, but then failed to do so. Instead, he relied solely on the bow thruster, which eventually malfunctioned. This argument would carry more weight had the Baker personnel not been aware of the fact that the vessel was not anchored. Once Tidewater informed them of the situation, it fulfilled its duty to notify its customer and can not be said that its actions were negligent. Also, the issue of a breach of contract for failure to use due diligence in providing a seaworthy vessel due to the failure of the Dynamic Positioning System (DPS) was raised, but carries little weight. According to Baker's own testimony, it was aware of the inoperable DPS system and had never used it since its installation on the vessel. The vessel was not being used

-21-

as a DPS capable vessel.

Based on the foregoing, the Court finds there is no breach of the contract provisions that would vitiate the contract and relieve Baker of its obligation to indemnify Tidewater. Tidewater had an obligation to provide and maintain a seaworthy vessel, fit for its intended use, through the exercise of due diligence. Established law dictates that a maritime contract is interpreted using the general rules of contract construction and interpretation. That is, the Court must read the contract as a whole. The Court finds, after considering the totality of the evidence, that Tidewater exercised due diligence with respect to its obligations to Baker and that any failures to do so did not rise to a level which would relieve Baker of its contractual obligations. Even if the vessel was, or became, unseaworthy during the pertinent times or Tidewater acted in a negligent manner, the indemnification provisions of the Blanket Time Charter in effect at the time of the accident absolve Tidewater from any liability for its negligence or unseaworthiness that resulted in injury to Seth Becker, Baker's employee.

For the same reasons discussed above, the Court also finds that Tidewater's actions fall short of gross negligence. A finding of gross negligence could vitiate the indemnity obligations set forth in the Time Charter Agreement. Under Louisiana law, gross negligence is willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence. *The Houston Exploration Company v. Halliburton Energy Services, Inc.*, 269 F.3d. 528 (5th Cir. 2001). Tidewater's negligent actions in failing to inspect the anchor during its quarterly inspections, proceeding with the gravel packing job in rough seas without a functioning anchor, and moving the boat without warning fall within the realm of ordinary negligence. The most egregious conduct, that of moving the boat without warning, was taken in an effort to avoid an

-22-

allision between the vessel and the rig.  Although Captain Lachney was aware that such action would move the hose on the vessel, there is no evidence to show that his actions rise to the level of gross negligence.  Allowing the vessel to allide with the rig and possibly cause catastrophic harm to all involved might have.  Additionally, for the reasons previously stated, the failures of the anchor and bow thruster also do not rise to the level of gross negligence.  There is simply not enough evidence to prove that Tidewater's deficiencies were anything more than ordinary negligence.  As stated by the *Marquette* Court, "Under Louisiana law, contracts limiting liability are generally valid and enforceable."  It is held that the contract provisions doing so in this case are just that.

## ALLOCATION OF FAULT

For the foregoing reasons, and after full consideration of the record and all evidence presented, the Court allocates fault between Tidewater and Baker as follows:

**BAKER: 55%**

**TIDEWATER: 45%**

As previously discussed, Falcon is found to be free from liability in this matter.  Additionally, it is noted that the Fifth Circuit affirmed the determination of no liability as to the component manufacturers.  *Becker v. Tidewater, Inc.*, 335 F.3d 376, (5th Cir. 2003)

-23-

## DAMAGES

Tidewater, as owner of the M/V Republic Tide, and Baker, as time charterer of the vessel, are both liable to the plaintiff under section 905(b) of the Longshore and Harbor Worker's Compensation Act. The damages recoverable under this section are generally the same as those under general maritime law. Damages available to the plaintiff include past and future medical costs; past and future loss of wages/benefits; pain and suffering; mental/emotional injuries; and loss of enjoyment of life. *Williams v. Chevron,* 875 F.2d. 501 (5th Cir. 1989).

A full, detailed recitation of the massive injuries suffered by Seth Becker is not necessary, as the extent of this young man's damages is uncontested and well documented throughout the record of this case. The damages suffered by this young man are horrific and extreme. Following the butchering of his legs by the steel Coflex hose, Seth laid on the main deck of the rig, in his own blood, for almost two hours before being evacuated. It is important to note that, during this time period, he lost approximately 8-9 pints of blood without losing consciousness and remained on the deck with his own leg on his chest. His right leg was openly amputated and his left leg was attached only by tissue threads.

Following his evacuation, he endured nine surgeries and a near death episode of tachycardia, which led to massive blood transfusions. His in-folded and irregularly scarred stumps have, according to uncontroverted medical testimony, caused great concern for future new problems. It is undisputed that the condition of his stumps will only get worse with time and that future surgeries are a certainty. Any new additional problem and/or surgical procedure will certainly give rise to a cause for refitting Seth's artificial limbs–a costly and painful process. Shortly after the accident, Seth also contracted osteomyelitis, a threatening disease hidden in the

-24-

bones of his stumps.  Osteomyelitis can cause severe infection, permanent bone damage, and can lead to death.  This condition can be maintained, but is incurable.  The osteomyelitis caused dire problems for Seth and led to extreme treatments, including the intravenous administration of powerful antibiotics through a catheter inserted from his collar bone into the center of his chest. This treatment lasted several months.  It is almost certain that this condition will recur.

Additionally, Seth suffered severe mental and emotional problems as a result of the accident and the massive blood loss.  He has suffered such atrocities as agonizing phantom pain and nightmares involving maggots coming from his chest and other horrors.  It has been confirmed that he suffered cognitive brain damage as a result of the blood loss and that the brain damage reflects significant impairments to the frontal lobe, the most fragile area of the brain. This brain damage is permanent.  Further, Seth suffers from chronic pain disorder,  chronic depression and post traumatic stress disorder.  The list is seemingly endless.

The totality of the harm suffered by Seth Becker, a faultless young man, has impacted his life in ways that are hard to imagine.  His life is forever altered.  Every day is now a struggle for him and will remain so until his last day.  There is no aspect of his life that remained untouched or will remain untouched by the horrendous events of June 8, 1999.

After a thorough review the evidence of damages submitted to the Court in the original trial, as well as the updated information supplied at the second (limited) trial of this matter, the Court holds that the Plaintiff has sustained damages in the following amounts:

| | |
|---|---|
| **Stipulated Past Medical Expenses:** | **$661,351.55** |
| **Future Medical Expenses:** | **$15,334,440.00** |
| **Past Lost Wages:** | **$362,435.00** |

| | |
|---|---|
| **Impairment of Earning Capacity or ability in the future, including impairment in the normal progress of plaintiff's earning capacity due to his physical or mental condition** | **$3,393,532.00** |
| **Past physical pain and suffering, including physical disability and impairment, past loss of enjoyment of life, and inconvenience in the normal pursuits and pleasures of life** | **$4,000,000.00** |
| **Future physical pain and suffering, including physical disability and impairment, future loss of enjoyment of life and effects of the injuries and inconvenience on the normal pursuits and pleasures of life** | **$5,000,000.00** |
| **Past mental anguish and suffering including feelings of economic insecurity** | **$3,000,000.00** |
| **Future mental anguish and suffering, including feelings of economic insecurity (includes quality of life items in the amount of $2,034,121.00)** | **$4,000,000.00** |

As noted by the Fifth Circuit Court of Appeals in *Marathon Pipe Line Co. V. M/V Sea Level II,*  806 F.2d. 585 (5th Cir. 1986), an award of prejudgment interest is committed to the sound discretion of the district court.  It is held that Seth Becker is entitled to an award of prejudgment interest on his past damages from the date of the accident, June 8, 1999 until entry of this judgment, at a stipulated rate of 6.052% per annum.  The plaintiff is also entitled to an award of post-judgment interest on the entire judgment until payment is made in full.

-26-

THUS DONE and SIGNED on this ___13___ day of _November_, 2007.

_____
CHIEF JUDGE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA